IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AMANDA ROBERTS,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>Defendant. | CASE NO. 1:26-cv-689<br><br>DISTRICT JUDGE JOHN R. ADAMS<br><br>MAGISTRATE JUDGE JAMES E. GRIMES JR.<br><br>**REPORT & RECOMMENDATION** |

Plaintiff Amanda Roberts filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In August 2023, Roberts filed an application for disability insurance benefits, alleging a disability onset date of July 31, 2023.[1] Tr. 11, 227. In her application, Roberts claimed that she was disabled due to pre-diabetes, heart

---

[1] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

murmur, bipolar disorder, severe anxiety, VACTERL syndrome,[2] weight loss, arthritis, depression, severe scoliosis, and trigeminal neuralgia. Tr. 257. The Social Security Administration denied Roberts's application and her motion for reconsideration. Tr. 116, 123. Roberts then requested a hearing before an Administrative Law Judge (ALJ). Tr. 152.

In March 2025, an ALJ held a hearing, during which Roberts and a vocational expert testified. Tr. 85–115. The following month, the ALJ issued a written decision finding that Roberts was not disabled. Tr. 15–26. The ALJ's decision became final on January 21, 2026, when the Social Security Appeals Council declined further review. Tr. 1–3; *see* 20 C.F.R. § 404.981.

Roberts filed this action on March 23, 2026. Doc. 1. She asserts the following assignments of error:

> 1. The ALJ committed reversible error by mistakenly classifying Ms. Roberts' migraines as a not severe impairment.
>
> 2. The ALJ committed reversible error by mistakenly classifying Ms. Roberts' mental health impairments as not severe.

Doc. 7, at 2.

[2] VACTERL is an "association of congenital anomalies." *See* Dorland's Illustrated Medical Dictionary, at 164 (33rd ed. 2020).

**Evidence**

*Personal and vocational evidence*

Roberts was 49 years old on the alleged disability onset date. Tr. 227. She completed the twelfth grade and last worked in 2023. Tr. 270.

*Relevant medical evidence*[3]

In August 2023, Roberts saw a pulmonary doctor for her COPD. Tr. 360. The treatment note recited Roberts's medical history of asthma, bipolar disorder, migraines, possible seizures, trigeminal neuralgia, and VACTERL syndrome. Tr. 360. The review-of-symptoms portion of the treatment record shows that Roberts had "no concerns regarding" depression and anxiety and she did not say that she experienced headaches. Tr. 362.

Later that month, Roberts telephoned her primary care provider's office and spoke to a nurse. Tr. 358. Roberts reported that she re-started Abilify eleven days earlier for her bipolar disorder and anxiety and said that it made her feel irritable and jittery. Tr. 358. Roberts asked if the nurse could prescribe something different. Tr. 358. The nurse answered that Roberts "[n]eeds to see psychiatry to treat bipolar disease." Tr. 359. The nurse advised that she could "take over care and refill psych medications once [Roberts is] stable on [a medication] regiment," so she "[o]nly initially refilled Ability to get [Roberts] back on prior regimen." Tr. 359.

---

[3] Roberts only challenges the ALJ's evaluation of her migraine headaches and mental health impairments. Doc. 7. So I only summarize the evidence related to these impairments.

In September, Roberts had a follow-up appointment for lab work at her primary care doctor's office. Tr. 351. The treatment note lists Roberts's diagnoses and the plan for each that was implemented at Roberts's August visit. Tr. 351–52. "Chronic migraine with aura" is listed; deemed "stable"; and Roberts's migraine medication, Rizatriptan, was refilled. Tr. 352. At the September visit, Roberts did not voice concerns about headaches or mental health issues. Tr. 353.

Two days later, Roberts visited the Cleveland Clinic Epilepsy Clinic as a new patient to be evaluated for seizures. Tr. 345. Self-reported screening tests for anxiety and depression were positive. Tr. 347. On exam, Roberts was alert, attentive, interactive, and well-groomed. Tr. 349. She had normal cognition, memory, speech, and affect. Tr. 349. The doctor continued Roberts on antiseizure medication, but changed the type of medication. Tr. 350.

In December 2023, Roberts followed up at the epilepsy clinic. Tr. 333. She reported doing well on her new medication. Tr. 34. She was looking for a job in retail. Tr. 334. Roberts's self-reported screening tests for anxiety and depression were positive. Tr. 335. On exam, Roberts was alert, fully oriented, and attentive, with normal cognition, memory, speech and affect. Tr. 337.

In February 2024, Roberts went to the emergency room for a worsening cough and chest pain. Tr. 579. She denied headaches and anxiety. Tr. 580. In April, Roberts went to the emergency room for a three-day history of sinus pressure, congestion, cough, and shortness of breath. Tr. 568. She denied

depression, anxiety, and headaches. Tr. 569. In May, Roberts went to the emergency room for right ear pain, tingling in her feet, and excessive urination. Tr. 557. She denied headaches and was not asked about anxiety or depression. Tr. 558.

In July 2024, Roberts went to the emergency room for intermittent "dizziness," which she described as "lightheadedness." Tr 548. She also reported nausea, vomiting, diarrhea, feeling feverish, and "bifrontal head discomfort." Tr. 548. Roberts said that she felt lightheaded when she "r[o]se[] from [a] supine position quickly." Tr. 548. The attending doctor suspected a viral illness, Tr. 552, and provided his impression that Roberts had acute dehydration and orthostatic lightheadedness, which is low blood pressure related dizziness when standing up, Tr. 553. The hospital administered intravenous saline and Roberts felt better. Tr. 552.

In October 2024, Roberts went to the emergency room for shortness of breath and a cough. Tr. 540. She had run out of her albuterol-inhaler medication. Tr. 540. In November, Roberts went to her primary care doctor's office and reported having experienced a possible seizure. Tr. 471. She had been out of her medications "for a couple of months." Tr. 471. She denied depression and anxiety. Tr. 473. She reported headaches, but also said that she had been out of her migraine medication for two months. Tr. 473–74.

In January 2025, Roberts saw licensed counselor Dawn Peters at a mental health clinic for a diagnostic assessment. Tr. 510. Roberts reported

multiple, ongoing symptoms of depression, anxiety, and post-traumatic stress disorder. Tr. 510. On exam, Roberts had a cooperative and pleasant attitude; a normal, appropriate affect; and a calm, friendly, happy, relaxed, euthymic mood.[4] Tr. 513. She had clear speech, normal thought process and judgment, and concrete and lucid thought content and perceptions. Tr. 513. Roberts had an intact memory and good insight and concentration. Tr. 513. Her behavior was "cooperative; engaged; motivated; normal; open; [and] pleasant." Tr. 513. She was attentive and said that her functioning in the followings areas was normal: working, self-care, and socializing with others. Tr. 513.

The next month, Roberts followed up with Peters for counseling. Tr 621. "Symptoms Reported/Observed" were listed as "[f]rustration, [a]nxiety." Tr. 621. Roberts actively participated in the session, and made good progress toward her treatment goals as evidenced by "working on decreasing her stress." Tr. 621.

[4] A euthymic mood is tranquil, neither depressed nor manic. *See* Dorland's, at 647.

*State agency opinions*[5]

In May 2024, Bruce Hallmann, MD, reviewed Roberts's record. Tr. 118–21. Regarding Roberts's residual functional capacity,[6] Dr. Hallmann opined that Roberts could perform light exertional level work—stand, walk, and sit for six hours in an eight-hour workday, and lift 20 pounds occasionally and 10 pounds frequently. Tr. 120. He also assessed postural and environmental limitations. Tr. 121.

In October 2024, Leon Hughes, MD, reviewed Roberts's record and agreed with Dr. Hallmann's opinion. Tr. 126–28.

*Hearing testimony*

Roberts, who was represented by counsel, and a vocational expert testified at the administrative hearing held in March 2025. Roberts testified that at the time of the hearing she worked 18 to 20 hours a week as a grill cook.

---

5 When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

6 A residual functional capacity, or "RFC," is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

Tr. 93–94. She said that she could not work more hours because she could not stand on her feet for too long. Tr. 94. Roberts also stated that she could not work full time due to carpal tunnel syndrome. Tr. 96.

When asked whether her mental health conditions have gotten better, worse, or stayed the same during the two years before the hearing, Roberts answered that her conditions have gotten "a little worse." Tr. 105. When asked how often she experienced a migraine, Roberts said that she experienced a migraine two to three times per week, and that they last for about 20 to 30 minutes. Tr. 107.

The ALJ discussed with the vocational expert Roberts's past relevant work as a cashier. Tr. 112. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Roberts could perform Roberts's past work or any other work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 112. The vocational expert answered that such an individual could perform Roberts's past job as a cashier. Tr. 112.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2029.
>
> 2. The claimant has not engaged in substantial gainful activity since July 31, 2023, the alleged onset date (20 CFR 404.1520(b) and 404.1571 *et seq*.).

> 3. The claimant has the following severe impairments: chronic obstructive pulmonary disease (COPD), VACTERL syndrome, and peripheral neuropathy (20 CFR 404.1520(c)).
>
> 4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).
>
> 5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b) and including the exertional abilities to lift and/or carry up to 20 pounds occasionally and up to 10 pounds frequently, to push and/or pull within those same weight limitations, and to sit, stand, and walk each for a total of about 6 hours in an 8-hour workday, except she is further limited in the following nonexertional respects:
>
> > – Cannot climb ladders, ropes, or scaffolds;
> > – Must avoid concentrated exposure to dusts, fumes, gases, odors, and poorly ventilated areas; and
> > – Must avoid all exposure to workplace hazards such as unprotected heights and dangerous moving machinery, and cannot perform any commercial driving.
>
> 6. The claimant is capable of performing past relevant work as a cashier. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).
>
> 7. The claimant has not been under a disability, as defined in the Social Security Act, from July 31, 2023 through the date of this decision (20 CFR 404.1520(f)).

Tr. 14–26.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4. What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. *see Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 422 (6th Cir. 2008). Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Jordan*, 548 F.3d at 423. The burden shifts to the Commissioner at step five "to prove the availability of jobs in the national economy that the claimant is capable of performing." *Id.* "The claimant, however, retains the burden of proving her lack of residual functional capacity." *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Walters Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court … asks whether" the "existing administrative record … contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* at 103. Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by

substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 587 U.S. at 99.

A court may "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice within which" the Commissioner can act, without fear of judicial "interference." *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605 (6th Cir. 2009) (quoting *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)).

**Discussion**

*The ALJ did not err at step two*

Roberts argues that the ALJ erred at step two when he evaluated her migraines and mental health impairments. Doc. 7, at 2.

At step two of the sequential evaluation, the ALJ determines whether a claimant has a "severe" impairment. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is one that significantly limits the claimant's physical or mental ability to do "basic work activities." *See* 20 C.F.R. § 416.920(c). An impairment is "not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience."

*Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243, n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). When an ALJ finds severe and non-severe impairments at step two and continues with the subsequent steps in the sequential evaluation process, any error at step two is harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the failure to find an impairment severe at step two is harmless error when the ALJ continues through the remaining steps of the evaluation and can consider non-severe impairments when assessing an RFC); *see Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) ("The fact that some of Anthony's impairments were not deemed to be severe at step two is…legally irrelevant" because the ALJ considered Anthony's severe and non-severe impairments in the remaining steps of the analysis) (citing *Maziarz*); *see also Hedges v. Comm'r of Soc. Sec.*, 725 F. App'x 394, 395 (6th Cir. 2018). "After an ALJ makes a finding of severity as to even one impairment, the ALJ 'must consider the limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.''" *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 577 (6th Cir. 2009) (quoting Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).

*Migraines*

Roberts argues that the ALJ erred when he evaluated her migraines. Doc. 7 at 9. She asserts:

> The ALJ dismissed Ms. Roberts' migraines as merely "past medical history" and "stable" while on various migraine medications. Tr 16. However, this was erroneous as the record clearly showed that Ms.

> Roberts suffered from migraines and associated symptoms on a consistent basis throughout the relevant time period.

*Id.*

As an initial matter, Roberts's assertion that the record "clearly showed" that she consistency suffered migraines is belied by her own recitation of the medical evidence in her brief, in which she only once mentions migraines and not once references headaches.[7] *Id.* at 3–7.

The ALJ explained why he did not find Roberts's migraines to be a severe impairment:

> migraines, also [documented] by past medical history and standing prescription for "rescue" medication (Maxalt), but as with trigeminal neuralgia reporting "stable" status of migraines on this medication (Ex. 1F/53,41), not even mentioned at the September 2023 neurologist consult (Ex. 1F/19-23), and with no reported migraine headache events in 2023, 2024, and March 2025 primary care office notes (see Ex. 1F/38-39,26,12-13; 3F/8; 7F/4-5)….

Tr. 16.

In support of her assertion that her migraines were not "stable" or merely listed in treatment records as past medical history, Roberts cites a treatment note which she describes as showing that she had "a history of

---

[7] The Court's Initial Order directs that "[a]ll facts relevant to the legal issues and discussion must be set forth in the *Facts* section" of the plaintiff's brief. Doc. 4, at 3.

'migraines.'" Doc. 7, at 10 (citing Tr. 353); *see also id*. (citing Tr. 472).[8] This only serves to prove the ALJ's point—reference to migraines in this treatment note and elsewhere in the record is listed as "past medical history." Tr. 353; *see* Tr. 380 (cited by the ALJ as "Ex. 1F/53"); *see also* Tr. 360. And Roberts's migraines were described as "stable" on medication. *See* Tr. 369 (cited by the ALJ as "Ex. 1F/41"). Moreover, while another page from Roberts's November 2024 visit shows that she reported headaches, Tr. 473, it also indicates that at that time she had been out of her migraine medication for two months, Tr. 474.

Roberts asserts that at an emergency room visit in July 2024, she reported "bifrontal head discomfort." Doc. 7 at 10 (citing Tr. 548). It is true that on this day, Roberts visited the emergency room for "dizziness, which she define[d] as lightheadedness." Tr. 548. She also reported nausea, vomiting, diarrhea, felling feverish, and "bifrontal head discomfort." Tr. 548. The doctor suspected a "viral illness" and his "[c]linical [i]mpression" was "[n]ausea[,] vomiting[,] … diarrhea, [a]cute dehydration, [o]rthostatic lightheadedness, [and] [s]ubjective fever." Tr. 552–53. Roberts was treated intravenously with "normal saline," felt better, and was discharged. Tr. 552. This does not show

[8] Roberts has not cited these treatment notes, and others she relies on, in the *Facts* section of her brief, as the Court's Initial Order requires. *See* Doc. 4, at 3. So Roberts has improperly presented these facts to support her argument, and the Court need not consider them. *See id*. at 4 ("The Court will not consider facts referenced in a party's argument unless those facts have been set out in the *Facts* section of the party's brief.").

that Roberts's migraines were not stable on medication or that she sought treatment for active migraines during the relevant period.

Next, Roberts tries to redefine what "lightheadedness" means. She submits that lightheadedness is the same thing as a headache; cites another treatment note in which she complained of lightheadedness; and suggests that this shows that she reported to a doctor that she was experiencing a migraine or a headache when she said that she was lightheaded. Doc. 7, at 10 (citing Tr. 526). The record doesn't support Roberts's interpretation of what "lightheadedness" means. In fact, at this emergency room visit for chest pain, Roberts expressly denied experiencing a headache. Tr. 528. Roberts's further attempts to link migraines with other isolated items in the record—a one-time symptom of ringing in her ears; her diagnosis of trigeminal neuralgia; and her reported history of a head injury or concussion, Doc. 7, at 10—lacks any foundational support.

Roberts recounts her testimony regarding her migraines. Doc. 7, at 10–11. The ALJ acknowledged this testimony, but found that Roberts's allegations regarding her symptoms were not consistent with the evidence in the record. Tr. 20. Roberts doesn't challenge this finding by the ALJ. She contends that her "migraines were so severe that she had a history of reporting to the emergency room because they were so unbearable." Doc. 7, at 11 (citing 550, 584). Transcript page 584 is from a February 2024 emergency room visit showing that Roberts had a chest x-ray due to her reports of chest pain. Tr.

584. Transcript 550 shows that Roberts reported headaches (as well as fever, chills, a cough, abdominal pain, diarrhea, nausea, vomiting, and arthralgias and myalgias) when she visited the emergency room in July 2024 for dizziness and lightheadedness. Tr. 548, 550. These records don't show that Roberts sought emergent care at this time or any other time for "unbearable" migraines.

Finally, Roberts alleges that the ALJ erred because he "did no further analysis of her migraines and did not properly evaluate them under SSR 19-4p." Doc. 7, at 11. She provides no further explanation for this argument. *Id.* To the extent that Roberts is arguing that the ALJ's step two discussion of her migraines ran afoul of Social Security Ruling 19-4p, which covers headache disorders, it fails because Roberts has not explained why she believes that this is so. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed [forfeited]"). To the extent that Roberts is arguing that the ALJ was required to analyze her migraines "further," she also hasn't explained what she means. The ALJ referenced Roberts's migraines later in the decision, when he explained the limitations that he assessed in the RFC. Tr. 19, 25. The ALJ therefore did not commit a procedural error. *See Nejat*, 359 F. App'x at 577 (explaining that the ALJ considers both severe and non-severe impairments when evaluating the claimant's RFC) (citing Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5).

*Mental impairments*

Roberts also challenges the ALJ's description of her mental impairments as "past medical history." Doc. 7, at 12. The ALJ considered Roberts's "bipolar [disorder], depression, anxiety, and PTSD (post-traumatic stress disorder)" and explained:

> For the alleged mental health conditions, the claimant does have a listed "past medical history" of bipolar affective disorder through primary medical care practice group, along with listed medications of Abilify 10mg (or generic aripiprazole), Wellbutrin 150mg, and Ambien 5mg (or generic zolpidem for "insomnia" component) (*see* Ex. 1F/53,41; *see also* Ex. 2E/5; 10E). But she did not mention any active symptoms of depression, anxiety, or difficulty sleeping when restarted or refilled on Abilify in August 2023, or in any subsequent primary care follow-up now extending through mid-March 2025, while displaying normal mood, affect, and behavior in a May 2024 encounter with another medical source (Ex. 1F/40,32; 3F/11).
>
> In late January 2025, the claimant attended an intake diagnostic assessment at OneEighty Inc. and presented with significant psychosocial stressors affecting her (being told to move out of her home within mere weeks and having no finances) and some limited reported difficulties consequent to these issues, including anger and inability to sleep (Ex. 4F/2). The altogether recent initiation of individual counseling sessions at OneEighty with Dawn Peters, L.P.C., is not supportive of her hearing testimony that anxiety, "tremors," depression, and bipolar symptoms have been worsening and "constant" over the past two years, especially when considering her additional testimony confirming that she had just started seeking treatment a month before the hearing despite being "right down the road" from this treatment center. Moreover, Ms. Peters is not an acceptable medical source under 20

> CFR 404.1502(a), and so her diagnoses of persistent depressive disorder, anxiety disorder, and PTSD do not qualify as medically determinable mental impairments (*but see* Ex. 4F/2,7). Moreover, Ms. Peters at most noted a concrete thought process with otherwise unremarkable mental status findings that also fail to support any present depression, anxiety, or anger as of the late January 2025 intake assessment. She observed euthymic mood and broad affect, cooperative and pleasant demeanor, normal psychomotor activity level (not agitated or slowed, appropriately dressed appearance, clear speech without noted rapidity or pressure, intact memory, good concentration and attentive behavior overall, and good insight and judgment (Ex. 4F/2,5).
>
> On their respective May 20, 2024 and September 24, 2024 reviews of the available written evidence, State agency psychological consultants (PCs) Jeannine Abbott, Ph.D., and Ermias Seleshi, M.D., had found insufficient objective medical evidence and other evidence to substantiate a medically determinable impairment(s) causing or otherwise relating to the alleged mental health conditions (Ex. 2A/3-4; 4A/3). The recent entry into counseling at OneEighty does not cure the objective medical insufficiency and, considering strongly Ms. Peters's unremarkable clinical findings at the intake assessment as well as the backdrop of no mental health difficulties shown as mentioned in the primary care setting, do not persuade for any possibly significant (more than minimal) symptom or limiting effect on the claimant's ability to do basic mental work activities. Therefore, I do not find a good reason to delay a decision in this matter so as to develop additional medical evidence for the alleged mental health conditions, such as to have the claimant attend a consultative psychological examination.

Tr. 17–18.

Roberts recites evidence showing that she received medication from her primary care provider. Doc. 7, at 13. This fact was cited by the ALJ, Tr. 17, and

it was a proper basis on which to rely for a non-severe finding, *see Napier v. Comm'r of Soc. Sec.*, 127 F.4th 1000, 1005 (6th Cir. 2025) (upholding the ALJ's non-severe finding at step two because, in part, the ALJ "emphasized that Napier's treatment history with respect to her anxiety and depression was quite limited [since] … she had been prescribed antidepressants by a medical (not mental) healthcare provider"). Roberts complains that "the ALJ seemed to dismiss Ms. Peters' treatment of Ms. Roberts as it was a 'recent initiation' of treatment." Doc. 7, at 13. But the ALJ's statement is accurate—the ALJ found Roberts's mental health symptoms were non-severe based in part on the fact that she had not sought further treatment until about 18 months after her alleged onset date and just two months before the hearing.[9] Moreover, as the ALJ observed, Roberts's mental status findings at that exam were mostly normal. Tr. 17.

Roberts says that at the January 2025 diagnostic assessment, she reported numerous symptoms which, she said, had been present for more than two years. Doc. 7, at 14. This does not undercut the ALJ's step two finding. Roberts points out that at a primary care visit in August 2023, the provider commented that Roberts's reported fatigue could be due to "depression" and

---

[9] Roberts takes issue with the ALJ's observation that she "had just started seeking treatment a month before the hearing despite being 'right down the road' from this treatment center." Doc. 7, at 13; Doc. 9, at 4; Tr. 17. But this was an accurate description of Roberts's testimony. Roberts testified that, previously, she stopped attending counseling at a former clinic because it was too far from her home and she didn't have transportation. Tr. 110. Her then-current clinic, she said, "was literally down the road [from her]." Tr. 110.

"mood." *Id*. (citing Tr. 368). But the note also says that Roberts's fatigue was "unspecified," and the provider indicated that she would rule out thyroid issues, vitamin deficiencies, and anemia. Tr. 368. Roberts says that the provider also speculated that Roberts's unintended weight loss may have been caused in part by her "[m]ood/stress." Doc. 7, at 15; Tr. 369. Neither of these suggestive comments by Roberts's provider shows that the ALJ erred when he found that Roberts's mental health symptoms were non-severe.

Finally, Roberts contends that "the ALJ failed to provide reasoning as to why he did not provide any limitations regarding a social interaction limitation based on Ms. Roberts' ongoing mental health impairments." Doc. 7, at 15. She provides no further explanation for this statement. The ALJ considered Roberts's reports of mental health limitations when assessing the RFC, Tr. 19, and Roberts has not identified what social-interaction limitations she allegedly had that the ALJ failed to assess.

All told, Roberts has not shown that the ALJ erred when he evaluated her migraines and mental health conditions.

**Conclusion**

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: September 10, 2026

*/s/ James E. Grimes Jr.*
James E. Grimes Jr.
U.S. Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–31 (6th Cir. 2019).